IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY D. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-CV-828-WKW [WO] |
| | ) | |
| CRH NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Larry D. Smith ("Smith") brings this action against CRH North America, Inc. ("CRH"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). (Compl. (Doc. #1).) This cause is before the court on CRH's motion for summary judgment on all claims (Docs. # 25, 26), Smith's response in opposition to CRH's motion (Doc. # 31), and CRH's reply (Doc. # 32). After careful consideration of counsel's arguments, the relevant law, and the record as a whole, the court finds that CRH's motion is due to be granted.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of each.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of Smith's employment with, and termination from, CRH.  Smith claims: (1) that CRH denied him the opportunity to apply for a supervisor position and failed to hire him as a shift supervisor because of his race (Compl. ¶¶ 34, 35), (2) that CRH disciplined and fired him in retaliation for opposing CRH's unlawful employment practices (Compl. ¶ 37), and (3) that he was subjected to a hostile work environment.

Viewed in the light most favorable to Smith, the evidentiary submissions of the parties establish the following facts.

### A.  Factual Background

#### 1.  CRH Hires Smith and Martin

CRH is a "Tier II" automotive supplier that manufactures and assembles seats and seat parts for "Tier I" suppliers, which then supply the parts directly to automobile manufacturers. (Benson Decl. ¶ 3 (Doc. # 27, Ex. 10).)  CRH maintains a logistics department with both shipping and receiving functions.  (Benson Decl. ¶ 3.)

According to Human Resources Manager Judy Benson ("Benson"), when openings for hourly positions arise at CRH, they are posted, giving current employees an opportunity to bid on those positions.  (Benson Decl. ¶ 5.)  CRH uses a staffing agency if it is unable to fill a position from its pool of employee applicants.  (Benson Decl. ¶ 6.)

In October, 2006, Production Scheduling Supervisor Ricky Coburn ("Coburn") communicated to Benson the need to hire one or more shipping coordinators.  (Coburn Decl.

2

¶¶ 2-3 (Doc. # 27, Ex. 11).)  The shipping coordinator position is an hourly position that typically pays between $10.50 and $13.50.  (Benson Decl. ¶¶ 7, 9.)  Benson posted the position on November 29, 2006,[1] giving CRH employees until December 4, 2006, to apply.  (Benson Decl., Attach. A.)  Three CRH employees (two of whom were white) bid on the position, but none was hired.  (Benson Decl. ¶ 7.)

Coburn notified Benson on January 2 or 3, 2007, of the "urgent need" to hire a shipping coordinator for the second shift.  (Benson Decl. ¶ 8; Coburn Decl. ¶ 3.)  Because CRH had been unsuccessful in finding a qualified applicant from its pool of employee-applicants, Benson promptly contacted Dianne Lee ("Lee"), who was, at that time, the Customer Service Representative for Walker Workforce Personnel, an employment agency.  (Benson Decl. ¶ 8;  Lee Decl. ¶ 2 (Doc. # 27, Ex. 16).)

Prior to this time, Smith, an African-American male, contacted Walker Workforce Personnel for help finding a job.  (Smith Dep. 71-72 (Doc. # 30, Ex. 6).)  Lee contacted Smith on January 3, 2007, with news of a job opening at CRH.  (Smith Dep. 72.)  The parties dispute what, exactly, Lee told Smith about the job opening.  According to Smith, Lee told him that she had faxed his resume to CRH and that CRH wanted to interview him for a *supervisor* position that paid $41,000 a year.  (Smith Dep. 72.)  CRH contends that Lee could not have mentioned the supervisor position to Smith because no such position was available

---

[1] Benson states in her declaration that the position was posted in October, 2006.  (Benson Decl. ¶ 7.)  However, a copy of the posting attached to Benson's declaration states that the "[d]ate posted" was "November 29, 2006."  (Benson Decl., Attach. A.)

at that time.  Lee provides conflicting statements that seem to support both sides.  (*Compare* Lee Letter, Mar. 2, 2007 (Doc. # 30, Ex. 2, Attach. A) ("I sent Larry Darnell Smith to CRH to interview for a supervisory position, after the interview he was offered a shipping coordinator position . . . .") *with* Lee Decl., Aug. 4, 2009, ¶ 4 ("I had no knowledge of any Shipping Supervisor position that was open at CRH.").)

It is undisputed that Smith interviewed with Benson at CRH on January 4, 2007. (Smith Dep. 74.)  Smith contends that Benson discussed the shipping supervisor position with him and told him that he was qualified for the position.  (Smith Dep. 77.)  Smith also contends that Benson told him he would start on January 5, 2007, but that Smith needed to speak to Coburn first because Smith would report directly to Coburn.  (Smith Dep. 77.) According to Smith, when he met with Coburn, Coburn told Smith that the shipping supervisor position was not available and offered him a shipping coordinator's position instead.  (Smith Dep. 84.)  Smith accepted the shipping coordinator position and began work on January 8, 2007.  (Smith Dep., Attach. 3.)

According to CRH, the shipping supervisor position did not become available until Customer Release Coordinator Herb Trawick ("Trawick") turned in his two-week notice of resignation on January 5, 2007, the day after Smith interviewed with CRH.  (Coburn Decl. ¶ 5.) Upon learning of Trawick's resignation, CRH contends that Coburn met with Logistics Manager Sam George ("George") to discuss how to replace him.  (Coburn Decl. ¶ 5.)  It was

then that Coburn and George decided to add a new shipping supervisor position.  (Coburn Decl. ¶ 5.)

CRH's handbook requires that supervisory positions be posted; however, CRH maintains that it does not enforce that provision of the handbook.  (Benson Decl. ¶ 5) ("[W]e have not enforced that provision and have not posted supervisory positions during my tenure as HR Manager for CRH.").)  Thus, rather than posting the newly-created supervisor position, Coburn suggested that CRH hire his friend Charles Martin ("Martin"), a white male who was then working as a manager at a hardware store, for the supervisor position.  (Coburn Decl. ¶¶ 6-7; Martin Decl. ¶ 4 (Doc. # 27, Ex. 12).)  CRH interviewed Martin on January 8 or 9, 2007, and offered him the position soon thereafter.  (Coburn Decl. ¶ 7.)  Martin accepted the offer and began work as a shipping supervisor on January 25, 2007.  (Martin Decl. ¶ 7.)

## 2.     *Smith's Thirty-Day Evaluation*

As with all hourly employees, Smith's employment with CRH was subject to successful completion of a ninety-day probationary period.  (Smith Dep. 89, 105; Benson Dep. 67 (Doc. # 27, Ex. 8).)  Probationary employees receive thirty-, sixty-, and ninety-day evaluations.  (Smith Dep. 105-06, Attach. 4-5; Benson Decl. ¶ 19).  Although Smith was counseled to improve his "attention to detail on all paperwork" because of an error on one of his loads, Martin, Smith's direct supervisor, rated Smith a "4" out of "5" for his first (thirty-day) evaluation.  (Smith Dep. 197-200, Attach. 6; Martin Decl. ¶ 10, Attach. D.)

### 3.    The Spitting Incident

After his thirty-day evaluation, Smith and Martin were involved in an incident that serves as the basis for Smith's hostile work environment claim.  Sometime in late February or early March 2007, Martin entered a room in which Smith and two white employees were present.  (Smith Dep. 155.)  Upon entering, Martin shook hands with the two white employees and then either spit or pretended to spit in his hand before offering it to Smith.  (Smith Dep. 155.)  Smith complained about this "spitting incident" on March 8, 2007, to Jimmy Simpler ("Simpler"), a member of CRH's management, Tammy Smith, a Human Resources Representative, Benson, and Ramsey.  (Smith Dep. 201-03, 206; Benson Decl. ¶ 20.)

### 4.    Smith's Sixty-Day Evaluation

On March 12, 2007, Martin and CRH employee Kevin Conatser ("Conatser") presented Smith with his second (sixty-day) evaluation.  (Martin Decl. ¶¶ 17-18.)  Due to multiple shipping errors committed in the previous month, Smith received a "2" out of "5" on overall performance.  (Smith Dep. 211-12, Attach. 7; Martin Decl. ¶ 16, Attach. E.)  The evaluation further stated that Smith needed to improve on the "accuracy of [his] paperwork" and with "contact[ing] supervisors when trucks do not arrive."  (Smith Dep., Attach. 7.)  During this meeting, at Coburn's request, Martin also presented Smith with a "discussion report," the first level of discipline at CRH, for a previous shipping error.  (Coburn Decl. ¶¶ 13-14; Smith Dep., Attach. 8.)  Coburn decided to issue the discussion report to Smith after

receiving notice from a customer that Smith had signed off on a load containing "serious" errors.  (Smith Dep. 213-15, 251, Attach. 8; Coburn Decl. ¶¶ 11-13, Attach. C; Martin Decl. ¶ 17.)

During the meeting to discuss the evaluation and the discussion report, Smith acknowledged that he had made a mistake (Smith Dep. 213-14), but acted hostile and confrontational, continually interrupting his supervisors.  (Martin Decl. ¶¶ 19, 21; Martin Dep. 24, 53-54, Attach. 6 (Doc. # 30, Ex. 9); Conatser Decl. ¶¶ 4, 6, Attach. A (Doc. # 27, Ex. 15).)  As a result of Smith's conduct, Martin ended the meeting (Conatser Decl. ¶ 4) and promptly called Coburn to inform him of Smith's behavior (Martin Decl. ¶ 20).

Coburn, Ramsey, and Conatser then held a second meeting with Smith (Coburn Decl. ¶ 17; Ramsey Decl. ¶ 6 (Doc. # 27, Ex. 18); Conatser Decl. ¶ 5.), during which Smith continued to act inappropriately.  (Coburn Decl. ¶ 17, Ex. E; Ramsey Decl. ¶ 7, Ex. B; Ramsey Dep., Attach. 3 (Doc. # 27, Ex. 6); Conatser Decl. ¶ 5.)  Due to his behavior during this second meeting, Smith was sent home for the remainder of the evening.  (Coburn Decl. ¶ 17, Attach. E; Ramsey Decl.¶ 7, Attach. B.)

The following day, Coburn recommended to Benson that Smith be terminated based upon his poor performance, refusal to receive counseling, and inappropriate conduct in the disciplinary meeting.  (Coburn Decl. ¶¶ 18-19; Benson Decl. ¶¶ 23-24.)  After meeting with Smith and investigating his conduct, Benson made the decision to terminate Smith's

employment with CRH.  (Benson Decl. ¶¶ 25, 27.)  Smith was terminated on March 14, 2007, having never completed his probationary period.

**B.    Procedural Background**

Smith filed his complaint against CRH on October 15, 2008, alleging race discrimination and retaliation for failure to hire for the supervisor position, and the existence of a hostile work environment, all in violation of Title VII.  (Doc. # 1.)  CRH moved for summary judgment on all claims on August 31, 2009.  (Docs. # 25, 26.)

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*); Fed. R. Civ. P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence

indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Celotex Corp.*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

However, if the evidence on which the nonmoving party relies, "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary

judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. DISCUSSION

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). Because Smith does not present direct evidence of discrimination or retaliation,[2] his Title VII claims are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"Under the *McDonnell Douglas* framework, a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination." *Brooks v. County Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer "to 'articulate

---

[2] Smith does not contend that direct evidence of discrimination exists in this case. Direct evidence of discrimination is evidence "that the complained-of employment decision was *motivated* by the decision-maker's [race discrimination]." *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999). Thus, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race]' will constitute direct evidence of discrimination." *Id.* at 1359 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).

some legitimate, nondiscriminatory reason' for the adverse employment action."[3] *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets its burden, the burden shifts back to the plaintiff to show that the employer's stated reason for the adverse employment action was "pretext" for discrimination. *Id.* The pretext inquiry requires a determination, based upon the totality of the evidence, as to whether the plaintiff "'has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). A plaintiff may meet his or her burden with the evidence used to establish his or her *prima facie* case. *Combs*, at 1528.

## A.     Race Discrimination for Failure to Hire

To establish a *prima facie* case of disparate treatment on the basis of race, Smith must show that (1) he is a member of a protected class; (2) "he applied and was qualified for a job for which the employer was seeking applicants"; (3) "despite his qualifications, he was rejected"; and (4) "after his rejection, the position remained open and the employer continued to seek applicants from persons of [his] qualifications." *McDonnell Douglas*, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff

---

[3] The principles in *Brooks* and *Crawford* apply equally to retaliation claims. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999) ("[T]he same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the *McDonnell Douglas* presumption.").

establish facts adequate to permit an inference of discrimination." *Holifield*, 115 F.3d at 1562.

The parties dispute whether Smith has presented sufficient evidence to create a genuine issue of material fact that he "applied and was qualified for a job for which the employer was seeking applicants." *McDonnell Douglas*, 411 U.S. at 802. CRH contends that "there was no vacant supervisor position available to [P]laintiff or any other individual at the time [P]laintiff sought employment with CRH." (Def.'s Summ. J. Br. 23-24.) As evidence for its position, CRH points to the testimony of Coburn and Benson, both of whom stated that CRH was not looking to hire a shipping supervisor at the time Smith applied for a job with CRH. (*See* Coburn Dep. 47, 56-57; Coburn Decl.¶ 5; Benson Dep. 48; Benson Decl. ¶ 10.) CRH contends that it was not until Trawick turned in his resignation notice on January 5, 2007, which was *after* Smith was hired as a shipping coordinator, that the shipping supervisor position became available.

Smith contends, on the other hand, that Lee contacted him on January 3, 2007, about an available supervisor position at CRH that paid $41,000 a year. As evidence for this contention, Smith submits his own deposition and declaration testimony, Lee's affidavit, and a March 2, 2007 letter signed by Lee. According to Lee's affidavit, submitted in support of Smith's opposition brief, the hiring agency sent Smith to interview for a supervisor position at CRH. (Lee Aff. ¶ 5.) Lee's letter, written on Walker Workforce stationary, states as follows: "I sent Larry Darnell Smith to CRH to interview for a supervisory position, after the

13

interview he was offered a shipping coordinator position and he accepted on 1-5-2007." (Lee Letter.)  In her August 21, 2009 affidavit, Lee testified in reference to the letter, that "[a]t the time that these documents were written, I was truthful in what was stated in each."  (Lee Aff. ¶ 4.)

CRH maintains that Lee's reference to an open supervisor position does not create a genuine issue of material fact that the position was available because her letter and August 21, 2009 affidavit never specifically reference an available *shipping* supervisor position. However, the only supervisor position at issue in this case is the shipping supervisor position, and neither party contends that there was any another supervisor position for which Smith could have interviewed.

CRH further contends that Lee's statements in her August 9, 2009 declaration – that she had "no knowledge of any Shipping Supervisor position that was open at CRH"– clearly show that no such position was available.  (Lee Decl. ¶ 4.)  However, Lee's contradictory statements only muddy the waters, and the court is not in a position to make a factual determination as to which of Lee's statements represents the truth in this case.  *See Duffy v. Lowe's Home Center, Inc.*, 414 F. Supp. 2d 1133, 1141 (M.D. Fla. 2006) ("If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial.").  Furthermore, the court notes that CRH did not submit Trawick's resignation letter as evidence of when the shipping supervisor position became available, despite admitting the existence of such evidence.  (*See* Def.'s Reply Br. 10, n.6 ("Tra[]wick's resignation letter[,]

14

dated January 5, 2007, was produced to [P]laintiff during discovery.").)[4]  This, in addition

to Smith's testimony, is enough to create a genuine issue of material fact as to whether a

shipping supervisor position existed at the time Smith interviewed at CRH.

CRH contends that even if a shipping supervisor position was available, Smith cannot

meet his burden in showing that he was qualified for the position.  Specifically, CRH

maintains that Smith was not qualified for the supervisor position because he lacked the

requisite managerial experience.  In fact, insufficient managerial experience is the only

reason CRH gives for why Smith was not qualified for the position.  (*See* Def.'s Summ. J.

Br. 24-25.)  CRH contends that it needed to hire someone with "*substantial* management

experience" (Def.'s Summ. J. Br. 8 (emphasis added); *see also* Coburn Dep. 153-55; Coburn

Decl. ¶ 5), and that although Smith "once had the title of Assistant Warehouse Manager[,]

. . . he had [n]o supervisory duties."  (Def.'s Reply Br. 3.)

CRH lists the following qualifications for the supervisor position:

-        Ability to work independently and with minimal instructions.
-        Ability to prioritize and perform multiple tasks in a timely manner.
-        Strong team player with ability to interact with all functional areas.
-        Preferabl[y] 2+ years experience in a warehouse, stock room, manufacturing operation.
-        Preferably 1+ year production control experience.

_____

[4] The court further notes that in its "Position Statement," which was filed in response to Smith's
EEOC Charge of Discrimination, CRH did not specifically state that the supervisor position was not
available when Smith interviewed at CRH.  (Position Statement, Mar. 13, 2007 (Doc. # 30, Ex. 4).)
Instead, CRH stated that Smith "was not offered, interviewed for, or considered for a supervisory
position."  (Position Statement, 1-2.)  While this statement does not squarely contradict CRH's current
position, it is noteworthy that CRH did not contend that no position was available in its response to the
EEOC charge of discrimination.

- Ability to use Microsoft Office applications and to learn computer applications.
- *Management experience* and good organizational skills.
- Good [c]ommunication skills.

(Martin Dep., Attach. 9 (emphasis added).) Nowhere in these qualifications is it required that a candidate have "substantial" management experience or "supervisory" experience; rather, these requirements simply state that a qualified candidate will have "management experience." CRH's assertion that "Plaintiff's resume reflect[s] *no* management experience" (Def.'s Reply Br. 8 (emphasis added)) misconstrues the evidence. Smith's resume, attached as evidence to CRH's summary judgment brief, states that Smith worked as an "Assistant Warehouse *Manager*" for three years. CRH fails to explain how three years as an assistant warehouse manager does not qualify as "management experience" under the listed qualifications. As the Eleventh Circuit held in *Carter v. Three Springs Residential Treatment*, "[t]he drafters of the job description may have intended something more, but shoddy drafting does not give an employer license to redefine job requirements on the fly in an attempt to win summary judgment." 132 F.3d 635, 643 (11th Cir. 1998). Accordingly, a genuine issue of material fact exists as to whether Smith was qualified for the supervisor position,[5] and Smith has met his *prima facie* burden.

---

[5] CRH cites *Williams v. Alabama Industrial Development Training* to support its contention that Smith failed to meet his *prima facie* burden by failing to show that he was qualified for the position he sought. 146 F. Supp. 2d 1214 (M.D. Ala. 2001). In *Williams*, the employer maintained a written list (a "decree") setting forth the criteria for promotion. *Id.* at 1220. One way an employee qualified for promotion was by taking on additional job responsibilities. *Id.* Instead of providing evidence that he took on additional job *responsibilities* as required in the decree, the plaintiff only provided evidence that he took on additional work within his current job responsibilities. *Id.* at 1221. Thus, the court found that the plaintiff failed to present any evidence that he met the criteria for promotion. *Id.* Here, construing the evidence in favor of the non-movant, Smith does present evidence that he met the employer's

16

Because Smith has raised an inference of discriminatory intent, the burden shifts to CRH to "'articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Crawford*, 529 F.3d at 976 (quoting *McDonnell Douglas*, 411 U.S. at 802). CRH meets its burden by presenting evidence that (1) it did not interview Smith for the supervisor position on January 4, 2007, because no such position was available; (2) once the position became available, Smith had already accepted a job as a shipping coordinator; and (3) Martin had significantly more management experience and was thus more qualified for the job.

Once the employer successfully carries its burden, the presumption of discrimination dissipates, and "only the ultimate question [of] whether the employer's offered explanations are pretextual" remains. *Carter*, 132 F.3d at 643. Thus, to survive summary judgment, Smith "must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondisciminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (emphasis added). The evidence used to meet a plaintiff's *prima facie* burden is often relevant at the pretextual stage. *Carter*, 132 F.3d. at 644. Therefore, evidence that the supervisor position was available and that Smith was at least minimally qualified for the position is relevant, though not dispositive, of the pretext issue.

---

requirements for the supervisor position, *i.e.*, that he had some managerial experience. Thus, *Williams* is distinguishable.

17

Smith contends that the following evidence, offered in connection with his *prima facie* case, demonstrates that CRH's stated reasons for not hiring him were false: (1) Lee's affidavit and letter, stating that Smith was sent to interview for a supervisor position at CRH, (2) Smith's testimony of what occurred during the interviews, (3) the lack of evidence regarding the exact date of Trawick's resignation, and (4) Smith's resume, showing his managerial and automotive parts experience. It is unnecessary to rehash the arguments made in connection with Smith's *prima facie* burden – suffice it to say that Smith has demonstrated that a genuine issue of material fact exists that the position was available and that he was at least minimally qualified for the position. He has thus squarely rebutted CRH's first proffered reason – that the position was not available when he interviewed at CRH. Further, because there is a genuine issue of material fact whether the position was available, the court need not determine if there is a genuine issue that CRH's second proffered reason – that Smith had already accepted another job once the supervisor position became available – was pretext.

Smith is faced with a more difficult task in rebutting CRH's third proffered reason – that Smith was not as qualified as Martin for the position. A plaintiff may not establish pretext simply by showing that he or she was qualified, or even *more* qualified, for the employment position at issue. *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001). As the Eleventh Circuit in *Chapman* held:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the

employer.  Provided that the proffered reason is one that might motivate a
reasonable employer, an employee must meet that reason head on and rebut it,
and the employee cannot succeed by simply quarreling with the wisdom of that
reason.

229 F.3d at 1030.  Thus, Smith must do more than present evidence that he was minimally

qualified for a supervisor position at CRH; he must present evidence that race, and not his

alleged inadequate qualifications, was the real reason he was not hired.  In other words, he

must show that CRH has not provided an honest explanation of its behavior.  *Id.*

Smith emphasizes the need for CRH to promulgate hiring and promotion policies and

contends that CRH's failure to post the shipping supervisor position in violation of its written

policy is "strong evidence of discriminatory motive."  (Pl.'s Resp. Br. 21.)  Indeed, the

Eleventh Circuit has held that when an employer purports to hire or promote one employee

over another on the basis of respective qualifications, circumstantial evidence of subjective

hiring standards, failure to follow established hiring standards, and past incidents of

discriminatory conduct may create a genuine issue of pretext.  *See Carter*, 132 F.3d at 644;

*Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1382-83 (11th Cir. 1983).

Here, CRH has a written employment policy that states, in relevant part:

Any Salaried positions will be posted on the bulletin board in the lobby. . . .
As always, the Company will try to fill the position from within but sometimes
it will be necessary to hire outside so as to hire the candidate that, at the
Company's discretion, is best suited for the job.

(CRH Policy (Doc. # 30, Ex. 11, Attach. 7, p. 18).)  It is undisputed that CRH did not follow

this procedure in filling the shipping supervisor position.  CRH maintains, however, that it

19

"never posted supervisory positions," and, therefore, it did not discriminate against Smith by failing to follow the policy on this occasion.  (Def.'s Reply Br. 11.)  In other words, CRH argues that it followed its unwritten policy of not following its written policy.  However, as the Eleventh Circuit has noted, such practices create purely subjective hiring standards – standards that can easily be manipulated for improper purposes.  *See Carter*, 132 F.3d at 644 ("'[S]ubjective evaluations involving white supervisors provide a ready mechanism for racial discrimination.'" (quoting *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir. 1985))). Failure to abide by written policies, when the effect is to give preference to a non-minority candidate, is, as the Eleventh Circuit has held, "suspicious."  *Id.* ("Certainly, it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process.").  However, this evidence alone does not satisfy Smith's burden.

Although this sort of subjective hiring practice can provide a mechanism for discrimination, Smith has failed to present evidence that it was used in such a way in this case.  Finding a genuine issue of pretext, the Eleventh Circuit in *Carter* and *Harris* did not rely solely on evidence of subjective hiring standards; in both cases, the court pointed to evidence of past discrimination in addition to the employer's subjective hiring practices.  *See Carter*, 132 F.3d at 645 (noting that three employees in addition to the plaintiff testified to experiencing disparate treatment at the hands of the employer); *Harris*, 712 F.2d at 1383 ("[T]he record indicates that the [employer] has an immediate past history of racial

discrimination and is still operating under the desegregation orders . . . ."). Here, on the other hand, Smith presents no evidence that CRH has a history of racial discrimination or that other employees have been subjected to disparate treatment on the basis of race. In fact, the undisputed evidence shows that the same subjective hiring standards that were used to hire Martin were used to hire Ramsey, an African-American male, to a supervisor position. (Benson Decl. ¶¶ 5-6.)

By simply showing (1) that the supervisor position may have been available at the time Smith interviewed with CRH, (2) that Smith was at least minimally qualified for the job, and (3) that CRH did not follow its written procedures in filling the supervisor position, Smith has not presented sufficient evidence to create a genuine issue of material fact that CRH's proffered reasons were a pretext for race discrimination. Accordingly, CRH's motion for summary judgment on this basis is due to be granted.

## B.    **Retaliation**

As stated above, Title VII makes it unlawful to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Smith must show: "(1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield*, 115 F.3d at 1566. At issue here are elements one and three.

21

Smith contends that he first engaged in protected expression when he reported an incident between himself and Martin that occurred in late February or early March 2007. On that day, according to Smith, Martin entered the room, shook hands with two white employees, then spit in his hand before offering it to Smith. Smith contends that he complained about this "spitting incident" on March 8, 2007 to Simpler, Tammy Smith, Benson, and Ramsey,[6] and on March 12 and 13, 2007 to Coburn, Ramsey, and Conatser. (Smith Dep. 229.) Even on the assumption that this speech constitutes "statutorily protected expression," Smith has failed to meet his burden under the causation prong of his *prima facie* case.

Causation can be established through evidence "'that the protected activity and the adverse action were not wholly unrelated.'" *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)).

---

[6] The substance of his complaints on March 8, 2007, amounts to the following: (1) a statement to Simpler that the relationship between Smith and Martin "was in a bad situation" and that "something's going wrong and I need help" (Smith Dep. 201-02); (2) a statement to Tammy Smith that "[Martin] discriminated against [Smith] when [Martin] came in the office and shook two white employees' hands and spit in his hand and offered to shake [Smith's hand]" (Smith Dep. 204); (3) a statement to Benson reporting the spitting incident and stating that "[Martin] is getting out of hand" and "I can't take it anymore, and I'm reporting it because I'm crying out for help" (Smith Dep. 206); and (4) a statement to Ramsey complaining about Martin "being a supervisor" and mentioning the spitting incident (Ramsey Dep. 141-42).

Smith contends that the temporal proximity of his termination to his complaints[7] is enough to establish causation under *Brungart*. (Pl.'s Resp. Br. 27 ("Smith can present evidence of the causal connection by showing the temporal proximity of the protected activity and adverse employment action.").) In *Brungart*, the Eleventh Circuit explained that "[t]he *general rule* is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." 231 F.3d at 799 (emphasis added). Despite this "general rule," however, the Eleventh Circuit has held that "[w]hen an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation." *Cotton v. Cracker Barrel Old County Store*, 434 F.3d 1227, 1232 (11th Cir. 2006); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

Here, Smith's mistakes on the job, coupled with his demeanor when confronted with these mistakes, set in motion an employment decision that had nothing to do with his complaints of racial discrimination. An employee cannot halt a legitimate employment

---

[7] Smith reported the alleged race discrimination on March 12 and 13, 2007. His sixty-day evaluation was delivered to him on March 12, 2007, and he was terminated on March 14, 2007. (*See* Benson Decl., Attach. G.)

decision with cries of discrimination.  Because Smith's termination had been set in motion

before he engaged in any protected expression, temporality alone will not suffice to meet his

burden under the causation prong of his *prima facie* case.  Accordingly, CRH's motion for

summary judgment on Smith's retaliation claim is due to be granted.

## C.   Hostile Work Environment

To establish a claim of hostile work environment under Title VII, Smith must show

the following:

> (1) that he belongs to a protected group; (2) that he has been subject to
> unwelcome harassment; (3) that the harassment [was] based on a protected
> characteristic of the employee . . . ; (4) that the harassment was sufficiently
> severe or pervasive to alter the terms and conditions of employment and create
> a discriminatorily abusive working environment; and (5) that the employer is
> responsible for such environment . . . .

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  As discussed

below, Smith has failed to meet his burden in showing that the alleged racial harassment was

sufficiently severe or pervasive to alter the terms and conditions of his employment, and, as

a result, CRH's motion for summary judgment on Smith's hostile work environment claim

is due to be granted.

In determining whether a workplace is sufficiently hostile or abusive, the court must

look to "all the circumstances" surrounding the plaintiff's employment, including "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating . . . ; and whether it unreasonably interferes with an employee's work

performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Workplace conduct is not measured in isolation." *Clark County Sch. Dist.*, 532 U.S. at 270.

The spitting incident – when Martin, after shaking the hands of two white employees, allegedly spit in his hand before offering it to Smith – serves as the sole basis for Smith's hostile work environment claim. (*See* Pl.'s Resp. Br. 32-24.) As evidence that this conduct was racially motivated, Smith presents testimony that Martin did not spit in his hand before shaking the hands of the two white employees. However, the uncontested testimony from Coburn, Martin, and Ramsey demonstrates that Martin engaged in this conduct with white employees on several occasions. (Martin Dep. 19-21 ("I had a habit of doing that with a lot of people. That was just comradery, I guess you would say."); Martin Decl. ¶ 13 ("I have made this gesture countless times over the years to white and black men alike. I typically will not make the gesture to someone I do not know."); Coburn Decl. ¶ 9 ("Throughout the time I have known Mr. Martin, he has had a habit of often blowing into his hand before he shakes hands with other people."); Ramsey Dep. 143 (testifying that Martin's habit of spitting in his hand before shaking is "just a thing that he does").) Further, Brandon Silcox, who was present during the spitting incident, stated in his declaration that "[i]t was clear to me that Mr. Martin [was] being light-hearted with Mr. Smith." (Silcox Decl. ¶ 4 (Doc. # 27, Ex. 14); *see also* Coburn Decl. ¶ 9 ("I see it as a way of putting the other person at ease and joking with them.").)

Even assuming that Martin's conduct was racially motivated, however, it lacks the frequency, severity, and impact necessary to survive summary judgment. *See Harris*, 510 U.S. at 23. Smith testified that he had never heard anybody at CRH use racial slurs and that he had never experienced anything that amounted to racial hostility. (Smith Dep. 158.) Furthermore, Smith testified that up until the spitting incident, Martin had never engaged in harassing conduct. (Smith Dep. 158, 165.) One isolated incident of this nature does not rise to the level of "severe or pervasive." Thus, CRH's motion for summary judgment on Smith's retaliation claim is due to be granted.

## V.  CONCLUSION

Accordingly, it is ORDERED as follows:

(1)    Defendant's motion for summary judgment on Plaintiff's race discrimination claim for failure to hire is GRANTED;

(2)    Defendant's motion for summary judgment on Plaintiff's retaliation claim is GRANTED; and

(3)    Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is GRANTED.

An appropriate judgment will be entered.

DONE this 4th day of February, 2010.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE
